UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————x

JACK GENTILE, as President of NEW YORK
AVIATION CORPORATION, and NEW YORK
AVIATION CORPORATION,

        Plaintiffs,

    -against-

JUDITH ANNE CONLEY and NOEL FRANCIS
BRACKS, as Executors and Trustees of the ESTATE
OF JOHN PATRICK CONLEY, and AUSTRALIAN
AIRCRAFT SALES (NSW) PTY LTD.,

        Defendants.

——————————————————————x

09 Civ. 5142 (CM)

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/11/09

## MEMORANDUM DECISION DENYING PLAINTIFFS' APPLICATION FOR AN EX PARTE ORDER OF ATTACHMENT

McMahon, J.:

    The court has been presented with an application for an ex parte order permitting the attachment of certain personal property allegedly found in this district belonging to defendants – the estate of an Australian testator and an Australian corporation not authorized to do business in New York. The application does not identify any particular property to be attached; the court does not know whether there is any such property in New York.

    The underlying complaint pleads the following facts, which are supported by an affidavit from plaintiff Jack Gentile:

    Plaintiffs are aircraft brokers, engaged in the business of consulting with and arranging meetings between buyers and sellers of aircraft. The late John Patrick Conley was Managing Director of defendant Australian Aircraft Sales (AAS).

    In 1994, AAS purchased 17 DC 9-32 aircraft from Garuda International Airlines in Jakarta, Indonesia. Plaintiffs, as brokers for AAS, began to remarket these aircraft throughout the world. Gentile negotiated the sale of 7 of the planes (Serial Numbers 47601, 47791, 47794, 47730, 47701, 47744, and 47740) from AAS to Midwest Express Airlines, which the court recognizes as a United States carrier. Plaintiffs allege, on

information and belief, that AAS delivered all seven planes to Midwest Express between 1995 and 2003, and that Midwest Express paid AAS for the planes.

During a conference call in October 1995 among Conley, Gentile and a Mr. Van Hoof, the agent of Midwest Express, AAS, through its agent Conley, agreed to pay plaintiffs a commission of $100,000 per plane sold. Plaintiffs assert that Gentile agreed with a third party, a Mr. Chang (who was allegedly an agent of AAS), to reduce the commission for the first two planes sold to $70,000 ($35,000 per plane) in a teleconference in October 1995, and that plaintiffs received that amount. They further allege that, in February 1996, Gentile received another $10,000 on account of the commission of $200,000 due and owing for the next two planes. Plaintiffs, however, objected to the deficiency.

In a telephone call that allegedly took place on February 25, 1996, decedent Conley allegedly told Gentile that plaintiffs would be paid $620,000 – the full amount originally promised ($100,000 per plane times seven planes) less the $80,000 already paid – once the sale of all seven planes to Midwest Express was completed. New York Aviation ("NYA") was also allegedly promised a bonus (sum unspecified), which was to be paid once all 17 Garuda DC-9s were sold.

In that same telephone conversation, Conley allegedly told plaintiffs that, if all 17 Garudas were not sold by February 2004, he personally would pay plaintiffs the balance of their commission ($620,000) pursuant to the terms of the original October 1995 agreement.[1] I assume that the word "he" refers to a personal guarantee by Mr. Conley, since the original contract was between AAS and plaintiff New York Aviation, both of which are alleged to be corporations. It seems obvious that Conley offered this deal in exchange for plaintiffs' forbearance from insisting on immediate payment of commissions as per the parties' original deal. Conley did not put his guarantee in writing.

The revised agreement as pleaded was that plaintiffs would receive the sum of $620,000 – the full value of the commissions as arranged back in 1995 -- when the last of the seven planes was sold to Midwest Express Airlines. Plaintiffs' complaint does not indicate the precise date when that occurred. It avers generally, and on information and belief, that the last plane may have been delivered at some unspecified time in 2003. (Ver Cplt. ¶ 3)[2] It seems clear from the rest of the allegations of the complaint that, whenever

---

[1] This aspect of the pleading is confusing to the court. Payment of the commission – as opposed to the bonus – by AAS was not contingent on the sale of the ten planes that were not purchased by Midwest Express, at least, not under the agreement as pleaded. The agreement pleaded was that plaintiffs would be paid commissions on each of seven planes that were sold to Midwest Express, and would receive a bonus payment once the other ten planes were sold. It was not necessarily the case that those two things – consummation of the deal with Midwest Express and sale of the other ten planes – would occur simultaneously. However, plaintiff is quite clear that Conley tied his guarantee to the sale of the other ten aircraft.

[2] To be precise, the complaint alleges, on information and belief, that, "between 1995 and 2003, defendants shipped and delivered all seven aircraft to Midwest Express Airlines and Midwest Express Airlines duly paid for the aircraft."

the last plane was delivered to Midwest Express, AAS did not pay NYA the $620,000 commission payment.

Plaintiffs allege that Gentile had a further conversation with Mr. Conley on February 15, 2004. In that conversation, Conley allegedly agreed that his personal guarantee of the $620,000 in commissions had ripened, because some of the Garuda aircraft remained unsold. Plaintiff attaches to his moving papers a fax transmittal of a letter purporting to confirm the contents of that telephone conversation and demanding immediate payment by wire transfer. The letter is signed by Gentile in his capacity as "Chariman, New York Aviation Corporation" and is on the letterhead of New York Aviation Corporation. No writing signed by Conley attests to his personal guarantee.

Further communications between Gentile and Conley did not result in NYA's receipt of payment. Conley died sometime in 2006. Apparently efforts have been made to collect on Conley's personal guarantee from his Estate; they have not been fruitful.

Now, halfway through 2009, some three years after Conley's death, plaintiffs have commenced an action against Conley's Executors and AAS, seeking payment of the missing $620,000 in commissions, plus interest.

Plaintiffs seek an *ex parte* order of attachment in order to secure their claim.

**The Relevant Law**

Fed. R. Civ. P. 64 authorizes a federal court to enter an order of attachment "under the circumstances and in the manner provided by the law of the state in which the District Court is located." Under New York's Civil Practice Law and Rules §6201:

> An order of attachment may be granted in any action, except a matrimonial action, where the plaintiff has demanded and would be entitled, in whole or in part, or in the alternative, to a money judgment against one or more of the defendants, when:
>
> > (1) the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state.....

This is not the only requirement. In order to obtain an order of attachment in New York, the plaintiff must show that he has a cause of action; that it is probable that the plaintiff will succeed on the merits; that the amount demanded from the defendant exceeds all counterclaims known to the plaintiff; and that an attachment is needed to secure payment or obtain jurisdiction. N.Y.C.P.L.R §6212; Capital Ventures Int'l v. Republic of Argentina, 443 F. 3d 214, 222 (2d Cir. 2006). The court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the facts pleaded.

However, even drawing all legitimate inferences in favor of plaintiffs, the court cannot issue an order of attachment against whatever assets of either defendant may be in New York.

### *(1) Are the Defendants Nondomiciliaries or Corporations Not Qualified?*

During his lifetime, Conley resided outside the state of New York. The court does not know where he resides at present, and neither does anyone else. His Executors are located in Australia.

AAS is alleged to be an Australian corporation. Plaintiffs represent that they have searched and have not found any evidence that it is qualified to do business in New York. The court accepts that representation for purposes of this motion.

Plaintiffs have satisfied the requirement of CPLR §6201(1); I thus turn to the requirements of §6212.

### *(2) Does Each Plaintiff "Have" a Cause of Action?*

Not a single fact pleaded in the complaint tends to show that Gentile personally has a claim against anyone. All of Gentile's allegations tend to show that he was at all times acting in his capacity as a corporate officer of his co-plaintiff, NYA, or as the agent of NYA (*see, e.g.,* Ver. Cplt. ¶¶ 9, 11, 12), when he dealt with AAS, Conley and Midwest Express concerning the seven planes. Any agreements that were entered into, either with AAS or with Conley personally, were entered into with NYA, though the medium of its agent and President, Gentile. The only party to whom commissions were allegedly owed was NYA. Even the letter confirming the February 15, 2004 telephone conversation between Conley and Gentile is on NYA letterhead and is signed by Gentile in his corporate, not his personal, capacity.

"JACK GENTILE, as President of NEW YORK AVIATION CORPORATION," which appears in the caption as a plaintiff, is not an entity capable of bring suit, because an individual who serves as the president of a corporation does not thereby become entitled to press claims belonging to the corporation. All of the claims that are asserted in this action belong to the corporation; and no legitimate inference can be drawn from the facts asserted in the pleading or in the supporting affidavit that would give Jack Gentile any right of recovery independent of the corporation's rights.

Because it does not appear that Jack Gentile has any cause of action against defendants, no order of attachment can issue in his favor.

NYA, however, "has" three causes of action.

*Is Plaintiff NYA Likely to Succeed on the Merits of its Claims?*

As to the three claims asserted by NYA, multiple issues are raised by the requirement that it demonstrate that it is likely to succeed on the merits of its claims before an attachment will issue; the principal ones relate to the statute of limitations and the statute of frauds. NYA does not always understand the implications of its own factual pleading, and it frequently makes irrelevant arguments. The court, without benefit of any briefing from the other side, has done its best to figure out whether NYA is likely to succeed on any of its three claims; I conclude that, on the facts presently pleaded, it has not discharged its burden of establishing likelihood of success.

### Breach of Contract

NYA asserts a claim for breach of a contract to pay it $620,000 in commissions allegedly earned for its brokering of the sale of seven planes by AAS to Midwest Express.

The contract that NYA seeks to enforce was allegedly entered into during a telephone call that took place on February 25, 1996. It represented a modification of an existing contract to pay $700,000 in commissions; that underlying contract was entered into between AAS and NYA in a telephone call that took place in October 1995. It is not memorialized in any writing.

Assuming that the claim is governed by New York law, it is subject to a six year statute of limitations, measured from the date of the breach. N.Y.C.P.L.R. § 213-2.

This lawsuit was commenced on June 3, 2009. If the breach took place on or before June 3, 2003, the breach of contract claim is time-barred; if after that date, it is not time-barred. It is, therefore, absolutely necessary to fix the precise date when the contract was breached. This NYA has failed to do.

On the facts pleaded, the contract as modified was due to be performed – that is, NYA was to be paid the entire $620,000 in commissions that were due and owing – upon the completion of the sale of the seventh and last plane to Midwest Express. Until that time, it does not appear that any commissions were owed. This being so, the modified contract to pay commissions could not have been breached prior to the date when the sale of the seventh plane to Midwest Express concluded. Whenever that occurred, $620,000 became immediately due and owing, and when the amount was not immediately paid, the statute of limitations began to run. It would be legitimate to infer that the seventh sale was "completed" when the seventh plane was delivered, since the first $70,000 in commissions was allegedly paid upon the delivery of the first two planes.

Unfortuately, all that is asserted in the pleading is that the seven planes were delivered between 1995 and 2003. Furthermore, even that vague allegation is made "on

information and belief," and neither the pleading nor Gentile's affidavit sets forth the basis for plaintiff's information or belief.

Without knowing the exact date when delivery was made but payment was not, the court cannot conclude that plaintiff NYA is likely to prevail on its breach of contract claim, because the claim may well be barred by the statute of limitations. If the last plane was delivered on or before June 2, 2003, then six year statute of limitations had run by the date when plaintiffs commenced this lawsuit (June 3, 2009). If the claim is time-barred, NYA would not be entitled to an attachment.

NYA must plead facts from which the court could infer that its claim for breach of contract was not time barred on the date the complaint was filed in order to be entitled to the extraordinary remedy of attachment. And if NYA pleads those facts on information and belief, then it must specify the basis for its information and belief in order to be entitled to any "legitimate" inference that the last plane was delivered on or after June 3, 2003.

This problem is not remedied by plaintiffs' assertion that Gentile's letter of February 15, 2004 -- which was not countersigned by either Conley or anyone else representing AAS -- "extended" the limitations period applicable to the breach of contract claim. Plaintiffs consistently fail to appreciate the terms of the agreement they plead. The claim against AAS is for breach of an agreement that AAS would pay NYA $620,000 "upon the sale of the seventh aircraft to Midwest Express Airlines." Any claim for breach of contract against AAS necessarily began to run from that date, and no other. By February 15, 2004, when the letter was written, the claim for breach of the contract had already accrued (since all the planes were delivered by, at the latest, some unspecified time in 2003) and the six year limitations period had already begun to run.

Contrary to plaintiffs' assertion, nothing in that letter "enlarged the original time period fixed for defendants' performance and payment" under the operative contract. Indeed, not a single fact is pleaded tending to show that anything was said at any time -- and certainly not in February 2004 -- about extending the due date for payment of the commission by any party, including AAS. The fact that the February 15, 2004 letter refers to the balance due "per our agreement [which plaintiffs in their brief erroneously assert is the 1995 agreement, rather than the 1996 modified agreement!] and your personal guarantee" is of no moment, because the fair inference from the facts pleaded in the complaint it that the seventh plane had apparently already been delivered by February 15, 2004.[3]

It is true that, back in 1996, when this agreement was allegedly made, Conley purportedly agreed that *he personally* would make good on the unpaid commissions if the rest of the planes were not sold (presumably to buyers other than Midwest Express) by February 2004. But not a single fact is pleaded or averred tending to show that AAS, the corporate defendant, either on its own on through an agent, agreed to do anything in

---

[3] In this regard, it is highly significant that plaintiff does not identify what the allegedly extended due date was.

February 1996 except pay the full amount of the commissions as soon as the seventh plane was delivered to Midwest Express. Plaintiff cannot conflate AAS's agreement to pay commissions with Conley's guarantee to make good on AAS's deb. Unless NYA pleads facts tending to show that the seventh airplane was delivered in February 2004 (which it most certainly does not), there is no way to make AAS's and Conley's separate and independent obligations come due on the same date.

There does not appear to be any statute of frauds barrier to the enforcement of the alleged oral agreement made by NYA and AAS in February 1996. A contract to pay a broker for service rendered from and in New York – even when the contra-party is located in Australia – is likely governed by New York law. Under New York's statute of frauds, Gen.Oblig.L. §5-701(10), certain types of brokerage agreements must be in writing; however, agreements to pay compensation for services rendered in the sale of goods, such as airplanes, are not among them.

The only thing that might take the contract out of the statute would be if the agreement *by its terms* could not be performed within one year. Gen.Oblig.L. §5-701(1). But nothing in plaintiff's complaint or moving papers alleges any facts from which one could legitimately infer that Midwest Express could not have taken delivery of all seven planes within one year from February 25, 1996. The terms of Midwest Express' contract are nowhere alleged, so the court has no idea whether that agreement set a schedule for delivery of the aircraft that would take the February 1996 modified agreement out of the statute. it is the time specified for Midwest Express' performance under its agreement with AAS that dictates the due date for performance of the 1996 agreement to pay commissions.

While the actual time for performance is not relevant for statute of frauds purposes – the only thing that is relevant is whether the contract to pay commissions by its terms could not have been performed within one year of its making -- the complaint alleges facts from which it appears that as many as four of the seven planes had been delivered by the time the original commission agreement was modified! This suggests that the contract to pay commissions could have been performed within a year. Only if the contract between Midwest Express and AAS made it impossible for Midwest Express to take delivery of all seven planes by February 25, 1997 would the commission payment agreement fall outside the statute of frauds. No facts are pleaded from which the court could infer that Midwest Express could not have performed its contract to purchase the planes within one year after February 25, 1996.

Ultimately, however, the fact that the unwritten agreement is apparently not barred by the statute of frauds is of no moment. Unless and until plaintiff fixes the date when the sale of the seventh plane was concluded with greater precision, it will not have satisfied the court that it is likely to prevail on its breach of contract claim, so no order of attachment can issue in favor of NYA against the assets of AAS in New York.

### Unjust Enrichment/Quantum Meruit Against AAS

NYA asserts claims against both defendants for unjust enrichment. I will here discuss only the claim for unjust enrichment against AAS, the corporate defendant.

This cause of action is asserted in the alternative. It assumes that AAS's contract to pay commissions to NYA (the contract discussed in the previous section of this opinion) is barred by the statute of frauds. It is the law in New York that, where enforcement of a contract is barred by the statute of frauds, an action in quantum meruit will lie for the reasonable value of services rendered, in order to prevent unjust enrichment. Frank v. Feiss, 266 A.D. 2d 825 (4th Dept. 1999); Geraldi v. Malmid, 212 A.D. 2d 575 (2d Dept. 1995).

However, as noted above, on the present record no facts are pleaded that would cause the underlying contract between NYA and AAS to be barred by the statute of frauds. Where a plaintiff has a claim for breach of an enforceable contract, no claim in quantum meruit can be considered; such a claim is only viable when the underlying contract between the parties is not enforceable under the statute of frauds. A breach of contract claim that is time-barred, by contrast, cannot be converted into a claim for unjust enrichment/quantum meruit. And here, the reason NYA cannot obtain an attachment in support of its breach of contract claim against AAS is that plaintiff has failed to establish that such a claim was timely on June 3, 2009, when it was asserted.

Therefore, NYA has not established that it is likely to succeed on its quantum meruit claim against AAS, and no attachment can issue in support of such a claim.

Even if the contract between NYA and AAS were barred by the statute of frauds, the quantum meruit claim itself would suffer from the same problem as the breach of contract claim: it is not possible, on the facts pleaded, to conclude whether the statute of limitations (six years from the date of the unjust enrichment, which coincides with the date of the alleged breach of contract) had run at the time the lawsuit was filed. Plaintiff NYA would have to plead and aver more specific facts about the date when the unjust enrichment occurred (which is to say, when the seventh plane was delivered and paid for) in order to satisfy the court that its claim was not time-barred.

### Breach of Conley's Personal Guarantee

Plaintiff NYA also pleads that Conley agreed, back in February 1996, that he would make good on AAS's obligation to pay the $620,000 in remaining commissions if all 17 Garuda DC-9s were not sold by February 2004.

Apparently assuming that the limitations period on this claim began to run in 1996, plaintiff goes to great lengths to argue that the statute of limitations on Conley's 1996 promise to pay the $620,000 if all the aircraft had not been sold by February 2004 was "extended" by Conley in the February 15, 2004 telephone conversation, memorialized in plaintiffs' letter to Conley of even date.

But there was no need to "extend" the limitations period because, on the facts pleaded, Conley had absolutely no obligation to pay anything to anyone until February 2004. The personal guarantee that is alleged is that, if AAS had not sold all 17 Garuda DC-9s by February 2004, he, Conley, would personally pay "plaintiffs" (really NYA, since Gentile personally was not owed any commissions) the remaining commission of $620,000. Putting to one side the fact that it was the *bonus*, not the *commission*, that was to have become due upon the sale of the seventeenth airplane – as discussed above, the commission became due as soon as Midwest Express bought the seventh of *its* planes, not when the seventeenth Garuda was sold – there could have been no breach under Conley's guarantee until February of 2004, which was Conley's self-imposed deadline for selling all the Garudas. The date when the guarantee was made is irrelevant for statute of limitations purposes; claims for breach of a guarantee accrue when the guarantee is breached, not when it is made. The instant action was commenced within six years of Conley's alleged breach of his guarantee obligation, which occurred in February 2004. Unlike the claim for breach of the contract between AAS and NYA, NYA's claim against Conley (or, more precisely, against his Estate) on the personal guarantee is unquestionably timely under the applicable six year statute of limitations.

However, the contract of guarantee pleaded in the complaint (in contrast to the contract discussed above) is a contract that by its terms cannot be performed within one year from the making thereof. It is, therefore, barred by the statute of frauds.

Conley purportedly made a promise in February 1996 that he would guarantee payment of the commissions if something had not happened by February 2004. By the terms of the contract, performance was not due until eight years after the making of the contract. Under New York law, the purported guarantee is void for failure to memorialize in a writing signed by Conley, the party to be charged. Gen.Oblig.L. § 5-701(1). Gentile's February 15, 2004, letter does not take Conley's guarantee out of the statute, because it is not signed by Conley – only by Gentile.

NYA cannot defeat this by asserting that it performed its obligation under the guarantee when it declined to press its claim for commissions immediately and forbore to do so until 2004. It is well settled that part performance by one party does not take a contract that cannot be performed within one year of its making out of the statute of frauds -- unless the contract is one relating to a transaction in real estate, which is not the case here. 61 N.Y. Jur. 2d, Frauds, Statute of, §300 ("The general rule [is] that the mere part performance of an oral contract not to be performed within a year does not take the contract out of the operation of the statute of frauds in actions at law…")

Therefore, AAS has not demonstrated that it is likely to succeed in its claim against Conley's Estate predicated on Conley's purported oral guarantee to pay the commissions out of his personal funds, and no attachment can issue.[4]

---

[4] It is possible that the contract is barred under a second and separate section of New York's statute of frauds – Gen. Oblig. L. § 5-701(2), which requires promises to answer for the debt of another to be in writing in order to be enforceable. Conley's promise unquestionably made him liable for AAS's corporate

### Unjust Enrichment/Quantum Meruit Against Conley's Estate

No claim in quantum meruit lies against the defendant Estate. Conley did not receive any services from NYA; AAS did. Therefore, Conley was not unjustly enriched by virtue of AAS's default.

On the facts pleaded, Conley cannot be said to have received any services from NYA by virtue of his status as managing director – or even owner -- of AAS. If facts were pleaded that would permit a piercing of AAS's corporate veil, the result might be otherwise, but no such facts are pleaded. One cannot legitimately infer that a corporation lacks independent existence from the fact that the person who conducts business on its behalf is either owner or Managing Director of the corporation; closely held corporations are accorded the same presumption of independence as other corporations in the absence of facts tending to show otherwise. Therefore, plaintiff NYA has not demonstrated that it is likely to succeed on the merits of any unjust enrichment/quantum meruit claim against the Estate.

### Conclusion

The *ex parte* application for an order of attachment is denied.

The court has scheduled a conference in this matter for October 2, 2009. Service should be made well before that date, in order to insure that defendants are able to participate in the conference.

Dated: June 11, 2009

_____
U.S.D.J.

BY ECF TO COUNSEL FOR PLAINTIFF

---

debt. There are, however, complicated issues about whether Conley's promise is a collateral promise (which falls within the statute) or an original and independent promise (which falls without the statute), and since the court need not answer those questions (on which there is absolutely no briefing) in order to rule, I decline to do so.